**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LATONYA BURNAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 5543** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Latonya Burnam brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Plaintiff subsequently filed a motion for summary judgment seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a motion for summary judgment seeking affirmance of the decision. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's motion and affirms the Commissioner's decision.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on November 30, 2006, alleging that she became disabled beginning on November 1, 2006 due to herniated discs and severe headaches.  (R. 11, 69). The Social Security Administration denied the application initially on March 2, 2007, and again on reconsideration on June 29, 2007.  (R. 11).  Pursuant to Plaintiff's timely request,

Administrative Law Judge ("ALJ") Joel G. Fina held a hearing on July 6, 2009, where he heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 25-62). On August 19, 2009, the ALJ found that Plaintiff is not disabled because she is capable of performing a significant number of jobs available in the regional economy. (R. 20-21). The Appeals Council denied Plaintiff's request for review on July 2, 2010. (R. 1-4).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. Plaintiff advances two main grounds for reversal. She first challenges the ALJ's residual functional capacity ("RFC") determination for three reasons: (i) the ALJ failed to give sufficient consideration to the opinion of Plaintiff's treating physician or explain why he discounted it, (ii) the ALJ improperly reached an independent medical conclusion, and (iii) the ALJ did not give sufficient consideration to Plaintiff's back pain and headaches. Plaintiff next argues that the ALJ erred in assessing her credibility by making an improper conclusory determination and by discounting her testimony about the inability to work more than 20 hours per week.

## FACTUAL BACKGROUND

Plaintiff was born on November 6, 1970, and was 36 years old when she applied for SSI on November 30, 2006. (R. 19). She has a high school education and completed about a year and a half of college, and is able to communicate in English. (19, 30). Her past relevant work experience includes jobs as a telemarketer and sales associate. (*Id.*).

A.    **Plaintiff's Medical History**

1.    **Back Pain, Headaches, and Heart Palpitations**

The record in this matter shows a history of complaints of back pain, headaches, and heart palpitations, among other ailments. The medical documentation begins in late

July 2006 when Plaintiff underwent an MRI of her lumbar spine due to lower back pain. (R. 356-357). The radiology exam report from Advocate South Suburban Hospital indicated "a very large central and left paracentral disc herniation noted at L5-S1" which "is seen compressing the L5 nerve roots" and "desiccation of the L4-5 disc space with evidence of an annular tear." (R. 357). Less than a week later, in early August 2006, Plaintiff presented at the emergency room complaining of lower back pain. (R. 478). She reported "a 4-year history of lower back pain ever since sustaining a fall down stairs." (*Id.*). While the pain had been "localized to the middle of the lower back" until recently, Plaintiff complained of new pain over the prior six weeks that she described as "deep, sharp, and aching, that starts in the left lower back, radiates down the left buttock and posterolateral thigh to about the level of the knee only." (*Id.*). An EMG of the left lower extremity and left mid and lower paraspinal muscles produced "mildly abnormal" results. (R. 478-479). Dr. Rana Mafee found evidence of "a mild, acute left lower lumbosacral radiculopathy," but noted that a "specific level cannot be isolated given the minimal findings in the left lower limb." (R. 339-340). A month later, in early September 2006, Plaintiff saw Dr. Reem Bitar at the Advocate South Suburban Hospital pain clinic, where she "refused to have [a] lumbar epidural steroid injection" and was advised to use over-the-counter pain medication or request a prescription if she wished. (R. 336).

In October 2006, Plaintiff consulted with Dr. James Stone, a neurosurgeon at the University of Illinois at Chicago. (R. 218-219). Dr. Stone noted that Plaintiff complains of "low back pain and left leg sciatica, bothered by prolonged sitting and standing and walking." (R. 219). Upon physical examination, he noted that Plaintiff "walks OK, up on heels and toes well" and that she has tenderness in the left sacral notch and mild

tenderness in her low back. (*Id.*). In a follow-up visit, Dr. Stone reviewed the July 2006 MRI films, confirmed the impression of a "very large" disc herniation at L5-S1, and recommended a "microlumbar diskectomy." (R. 218). Dr. Stone discussed the surgery and its potential complications with Plaintiff and her daughter, including reviewing the MRI films and answering their questions. (*Id.*). That same month, Plaintiff underwent a physical therapy evaluation and attended several physical therapy sessions. (R. 295-296, 301, 305, 307-308).

Plaintiff did not undergo surgery for her herniated disc and the record contains no further documentation of physical therapy. However, the record shows that she visited the emergency room on multiple occasions over the next two years complaining of back pain, headaches, and other ailments. For example, in late October 2006, she complained of headaches, nasal congestion, cough, and chest pain. (R. 290, 292). A chest x-ray was unremarkable. (R. 353-354). In November 2006, she complained of right ankle pain and chest congestion, for which an ankle x-ray showed "[n]o injury" and she was instructed to take Tylenol and follow up with her primary care physician, Dr. Olalekan Sowade. (R. 285, 287, 333, 353). In December 2006, she complained of back pain aggravated by a fall. (R. 281, 283, 331-332). She was given Vicoprofen and discharged in good condition. (R. 283, 332). The complaints continued in 2007. In January, an x-ray of Plaintiff's lumbar spine showed "mild degenerative disc disease" at L5-S1. (R. 351). In February 2007, she complained of nausea, vomiting, and headaches, for which she was given Toradol for the pain and Zofran for the nausea. (R. 273, 278, 329-330). After a six month break, in August 2007 she returned complaining of headaches and nausea, for which she was prescribed Amoxil and Tylenol #3. (R. 268-271, 328-329). The doctor's notes indicate Plaintiff "stated

that usually her headache is relieved with just Tylenol" and she "does not take anything more, because other medication does not work on her." (R. 328).

In September 2007, Plaintiff underwent another MRI of her lumbar spine, which found "noted dehydration of the disc at the level of L4-L5 and L5-S1." (R. 349). Specifically, the MRI report noted "local posterior central protrusion of the disc" at L4-L5 "with some effacement of the anterior part of the dural sac and mild degree of spinal stenosis, and "posterior ventrolateral extrusion of the disc" at L5-S1 "with significant effacement of the anterior central and lateral portion of the thecal sac on the left with moderate spinal stenosis." (R. 350) The report advised clinical correlation to determine the significance of the MRI findings. (*Id.*). Ten days later, Plaintiff again presented at the emergency room complaining of shoulder and neck pain after a car backed into a parked car in which she was a passenger. (R. 262, 327). She was diagnosed with a mild cervical sprain, for which she refused pain medication. (R. 328).

Shortly thereafter, in October 2007, Plaintiff returned to the emergency room complaining of headaches, nausea, back pain, and heart palpitations. (R. 257). She refused Toradol due to concerns about possible side effects and wanted to wait for the results of a head CT before making a decision on pain shots. (R. 259). The CT scan was normal. (R. 349). That same day, she was seen by Dr. Orlando Landrum at the pain clinic. (R. 326). Dr. Landrum noted that Plaintiff "states that she wishes to defer surgery" and was "not looking to have any interventional therapies performed and [was] primarily seeking medicinal control of her pain." (*Id.*). He noted that "[a]fter much discussion, [Plaintiff] defers neuropathic pain medication at this time." (*Id.*). He observed that Plaintiff "mentions multiple . . . Opiate medications she has been treated with in the past with some good

effect by other providers," including morphine, Endocet, and Norco. (*Id.*). He referred Plaintiff for a urine toxicology test, a stress test, and assessment of her cardiac issues by Dr. Sowade before considering narcotic medications. (R. 326-327). The subsequent stress test revealed "moderately limited functional capacity." (R. 343).

In November 2007, Plaintiff returned to the pain clinic due to headaches and neck and back pain. (R. 323). Her physical exam showed no change from previous visits. (*Id.*). Dr. Landrum prescribed oral morphine and suggested Plaintiff speak with a spine surgeon for a second opinion, try neuropathic pain medication for her back pain, and again consider epidural steroid injections. (R. 324). However, he noted that "[a]t this time, [Plaintiff] wishes to defer any interventional techniques." (*Id.*). In December 2007, Plaintiff continued to complain of heart palpitations, including an emergency room visit which produced a normal EEG and chest x-ray. (R. 248-255, 321, 347-348). An MRI scan of her cervical spine showed mild spinal stenosis at C6-C7. (R. 346-347).

Plaintiff's emergency room visits extended throughout 2008. For example, over three visits in March and April 2008, she complained of headaches, neck and ankle pain, and sinus congestion. (R. 243-244, 315-316, 318-320). Also during this time period, she was hit on the head with a piece of falling ice (R. 319) and subsequently hit her head at work (R. 410), although she exhibited "no new neurological deficits" and "[n]o neck tenderness or stiffness." (R. 316-317). A brain CT scan after the ice incident was "unremarkable." (R. 345). She continued to take only Tylenol for her pain, claiming that even "minimal dosages" of Percocet caused "episodes of palpitations." (R. 319, 320).

Also in April 2008, Plaintiff returned to Dr. Landrum at the pain clinic. He noted that Plaintiff was "previously assessed and advised in regards to using medications other than

short -acting medication for her pain in conjunction with neuropathic meds and potentially a trial of interventional treatment in regards to her pain," however Plaintiff "has refused all aforementioned attempts in trials in the past and requested to be placed on Tylenol #3." (R. 315). Dr. Landrum discussed with Plaintiff the "utility of trial of cervical epidural steroid injection for neck and head pain; however, [Plaintiff] is adverse [sic] to such treatment." (R. 315-316). He further noted that Plaintiff was unwilling to try medication stronger than what she has used in the past, therefore he placed her on Tylenol #3 as she requested and referred her to her primary care physician since "her current medications really do not require management by an interventional pain physician." (R. 315).

In May 2008, Plaintiff again complained of heart palpitations, headache, and nausea. (R. 402). A head CT scan showed "[n]o acute changes," a chest x-ray was normal, and a cervical spine x-ray showed "degenerative changes with large anterior spurs" at C6-C7, but otherwise was "unremarkable." (R. 344, 345). Plaintiff visited the Advocate South Suburban Hospital emergency room twice in October 2008 complaining of chest pain, dizziness, and nausea (R. 364-365, 372-373), but refused any pain medication, stating she "is very sensitive to all pain meds." (R. 373). That same month, she also presented at the emergency rooms of two additional hospitals complaining of, among other things, chest pain which was determined to be confined to the chest wall and unrelated to the heart or lungs, and for which she refused medication. (R. 425, 453). A chest x-ray was normal. (R. 466). She also refused medication for the dizziness of which she complained. (R. 449).

## 2.    Agency Reviewing Physicians

On February 22, 2007, Dr. M.S. Patil completed an Internal Medicine Consultative Examination for the Illinois Bureau of Disability Determination Services ("DDS"). (R. 222-225). Dr. Patil noted Plaintiff's complaints of headaches over the prior ten year period, beginning when she bumped her head on a cabinet and, around the same time, hit her head when her daughter ran into her. (R. 222). Dr. Patil stated that Plaintiff's headaches consist of "mild pain in the left temporal area, which worsens if she is under stress or does a lot of thinking." (*Id.*). She gets "some relief" by turning down the volume on the television or shutting the blinds, and takes hydrocodone "[i]f she cannot bear the pain." (*Id.*). In addition to headaches, Dr. Patil noted that Plaintiff has a herniated disc and has had "mild to moderate pain in the low back area" since falling on some steps in 2002. (*Id.*). Plaintiff stated that "she has mild difficulty and pain walking more than half an hour, standing for more than 10-15 minutes or lifting more than 10 lbs." (*Id.*). She "is able to do chores around the house like sweeping, mopping, laundry and dishwashing." (R. 222-223). Finally, Dr. Patil noted that Plaintiff was diagnosed with heart palpitations 8 years prior and states that she has palpitations "at least 2-3 times a week lasting a few minutes." (R. 223). A stress test in 2003 indicated she had suffered a "mild heart attack." (*Id.*). At the time of Dr. Patil's examination, Plaintiff was not taking any medications other than hydrocodone as needed. (*Id.*).

Dr. Patil's physical examination showed normal or unremarkable results in all areas, including finding Plaintiff's lumbar spine flexion, extension, and lateral extension to be within normal ranges. (R. 223-224). Dr. Patil's diagnostic impressions in the areas of Plaintiff's prior medical complaints — chronic headaches, chronic low back pain, and

history of heart palpitations — were normal or unremarkable, with the exception of his observation that a July 2006 MRI of Plaintiff's lumbar spine "showed a very large L5-S1 disc herniation" for which "surgery has been recommended." (R. 225). He noted that Plaintiff has not undergone surgery and there "has been no regular follow up care." (*Id.*).

On February 28, 2007, Dr. David Bitzer completed a Physical Residual Functional Capacity Assessment for the DDS. (R. 226-233). Dr. Bitzer stated that the objective medical evidence shows a history of disc herniation at L5-S1 and severe headaches that are treated with hydrocodone when needed. Upon examination, he noted as follows: "flexion of the L-spine to 50 degrees, extension 20 degrees, lateral flexion 20 degrees, SLR bilaterally at 25 degrees" and "[n]o paravertebral tenderness or spasm, BLE strength 5/5, sensation intact, gait normal unassisted." (R. 233). He concluded that Plaintiff is able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for at least 6 hours in an 8-hour workday, sit with normal breaks for at least 6 hours in an 8-hour workday, and push and/or pull with no limitations other than those indicated for lifting and carrying. (R. 227). He further noted that Plaintiff has "occasional postural limitations due to disc herniation L5-S1." (R. 228). Finally, he concluded that Plaintiff has no manipulative, visual, communicative, or environmental limitations. (R. 229-230).

On June 26, 2007, Dr. William Conroy completed a Request for Medical Advice for the DDS upon reconsideration. (R. 234-236). Dr. Conroy noted that Plaintiff "indicates she is in more pain" but "does not have any additional impairments" and was not seen for follow-up treatment despite her statement to the contrary. (R. 236). Dr. Conroy stated that

he reviewed the initial medical and RFC assessments and deemed them "appropriate." (R. 236). He affirmed Dr. Bitzer's RFC determination as written. (R. 235, 236).

## B.     Plaintiff's Testimony

At the hearing before the ALJ on July 6, 2009, Plaintiff testified that she works part-time as a sales associate at a Sears Parts and Repair Center for approximately five hours per day, three to four days per week, for a total of twenty hours weekly or less. (R. 31). She stated that she had not held full-time employment since 1994 or 1995, although she could not recall with certainty whether that employment was full or part-time. (*Id.*). Plaintiff testified that she is unable to work more hours because "[i]t's too painful" due to "severe headaches every day," "severe anemia," a herniated disc in her back, "some kind of nerve damage" in her leg, stenosis, heart arrhythmia, and "severe allergies." (R. 31-32).

In terms of her daily activities, Plaintiff testified that she is "[n]ot really" capable of doing chores around the house, so she does not wash dishes, do laundry, or do yard work or gardening, and her daughter or mother usually cooks and shops for her, although she will occasionally use the microwave herself and take an occasional trip to the store with her daughter. (R. 35-36). She tries to keep her home clean due to her allergies, including "sometimes" vacuuming even though "it's painful" and "the doctor said don't vacuum." (R. 34-35). Plaintiff testified that after working a five-hour shift, she is "in so much pain" and is too tired to eat or do more than lie down and pray. (R. 49). When she is not working, her days consist of occasional television viewing, reading, and resting. (R. 36-37). She attends church, but does not "really" socialize otherwise. (R. 43-44). Plaintiff stated that she does not drive and cannot cross the street or use public transportation due to vertigo

and "too much standing."  (R. 33-34, 45-46).  Her daughter's boyfriend drives her to work and previously her mother's friend drove her.  (R. 37).

As far as her medical conditions, Plaintiff testified briefly about her vertigo and herniated disc.  She said that she developed vertigo around October or November of 2008 and experiences it "every day" and is "always dizzy" at work.  (R. 41-42).  She had just "one incident" where she went to the hospital for vertigo, where she was prescribed Antivert that "turned it down," although she still has problems with falling, stumbling, and severe nausea.  (R. 42).  She also noted that her doctor recommended surgery for her herniated disc.  (R. 44).  Plaintiff testified that she "can't tolerate" pain medication because it causes palpitations, so "[her] doctor only lets [her] take regular strength Tylenol."  (R. 40).  More specifically, she stated, "If I take one Tylenol, [it] could seem like it's still in my system for about three or four days."  (R. 48).  If she took medication every four hours, her "heart will just race" and she "wouldn't be able to hardly breathe."  (*Id.*).

Plaintiff initially testified that she was able to perform her previous job with a telemarketing company where she was seated at a computer, however she later testified that her allergies were aggravated by the "dusty" work area and that sitting down was painful due to the herniated disc and leg pain.  (R. 37-38, 45).  She quit a subsequent job as a hotel housekeeper because it was "too physically strenuous."  (R. 37-38).  She testified that in her current job as a sales associate she will "go in the back and sit down for like an hour or so" when she can, but when customers are there she will "lean against the counter, or . . . on a pole."  (R. 38-39). She takes such breaks "very often" since her supervisor is not present "the majority of the time" she is working; however she fears she would be fired if her supervisor was there more often.  (R. 50-51).  Plaintiff indicated that

her supervisor told her she needs to reduce her absences from work so they do not exceed two per month. (R. 51-52). The ALJ asked Plaintiff whether she could perform a job for 40 hours per week that entailed very little lifting and allowed her to sit or stand to her comfort, such as answering phones or taking orders. (R. 44). She replied that she could not, "because with the headaches I'm confused a lot, with the sitting down, even like now I'm in pain, standing up I'm in pain." (R. 44-45). She also stated that she has trouble reading the computer screen and documents because she "ha[s] to refocus a lot" and, therefore, is prone to making mistakes. (R. 46).

**C.      Vocational Expert's Testimony**

Thomas Grzesik testified at the hearing as a vocational expert ("VE"). (R. 52). The ALJ described a hypothetical individual of Plaintiff's age, education, work experience, and skill set who is able to lift up to 20 pounds occasionally and lift or carry up to 10 pounds frequently in light work; never climb ladders, ropes or scaffolds; occasionally stoop, crouch or kneel; never crawl; and avoid concentrated exposure to environmental irritants and unprotected heights. (R. 55-56). The VE testified that such an individual could perform Plaintiff's prior jobs of telemarketer and sales associate, as well as other light, unskilled jobs available in the regional economy, such as cashier (20,000 jobs), officer helper (6,000 jobs), and production assembler (8,000 jobs). (R. 56).

The ALJ then revised the hypothetical to assume the same factors and limitations reflected in the initial hypothetical, but reducing the exertion level to sedentary. (R. 56). The VE testified that such an individual could perform Plaintiff's prior job of telemarketer, as well as other jobs available in the regional economy, such as call out operator (6,000 jobs), information clerk (4,000 jobs), and order clerk (1,000 jobs). (R. 57). Next, the ALJ

revised the hypothetical further to assume the same factors and limitations reflected in the second hypothetical, but adding the additional factor that the person "would be allowed to sit or stand alternatively at will provided that this person would not be taken off task more than 10 percent of the work period." (*Id.*). The VE testified that such an individual could perform the same jobs, available in the same numbers in the regional economy, that he identified in response to the second hypothetical. (R. 57-58).

Finally, the VE testified that there would be no full-time jobs available if the individual cannot "engage in sustained work activity on a regular and continuing basis for 8 hours a day, 5 days a week, for a 40 hour work week or an equivalent work schedule." (R. 58). He also stated that no jobs would be available to someone who regularly exceeds customary limits on absences, which are generally a half-day per month, and breaks, which are generally two 10-15 minute rest breaks and a half-hour lunch break with two-hour intervals of work separating them. (*Id.*).

## D.    ALJ's Decision

In his written decision, the ALJ found that Plaintiff has not been disabled since filing her SSI application on November 30, 2006. (R. 11). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff's part-time employment since the application date does not rise to the level of substantial gainful activity in light of her earnings. (R. 13). At Step 2, he then determined that Plaintiff has the severe impairments of degenerative disc disease of the lumbar spine, anemia, a history of chronic headaches, and allergies. (*Id.*). However, at Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). Specifically, the ALJ found that

despite her degenerative disc disease, multiple medical records establish that Plaintiff has full range of motion and normal motor strength, ambulates fully with normal gait, and has intact neurological and sensory functions. (*Id.*). The ALJ also found that Plaintiff's anemia was stable and blood oxygen levels were normal, and that despite her history of headaches, her recent CT scan was negative with no evidence of tumors, sensory or motor aphasia resulting in effective speech or communication, or disorganization of motor function. (*Id.*).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work that allows her "the option to sit or stand alternatively at will provided that [she] is not taken off task more than 10% of the work period," and further specifying that Plaintiff cannot crawl or climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs, balance, stoop, crouch or kneel; and must avoid concentrated exposure to unprotected heights and to environmental irritants such as fumes, odors, dusts, and gases. (R. 14-15). In reaching this determination, the ALJ considered Plaintiff's testimony and the medical records and opinion evidence. (R. 15). Based on this, he concluded that Plaintiff's herniated discs and severe headaches could reasonably be expected to cause the symptoms of which she complains, including "an inability to stand or sit for long periods of time and an inability to lift or carry items." (*Id.*). Nonetheless, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" to the extent they are inconsistent with the RFC finding. (*Id.*).

The ALJ elaborated on the reasons for his credibility finding. Of particular note, the ALJ identified numerous medical records from 2006 through 2008 documenting that Plaintiff

has full range of motion, normal strength in the major muscle groups, normal gait, and is able to perform a range of physical activities.  (R. 16-17)  The ALJ also found it significant that Plaintiff in certain instances found relief through medication and physical therapy, that she declined additional pain medication, and that her anemia was stable and treated with iron pills.  (R. 15-17).  Concerning her ability to work, the ALJ considered the state agency physician's RFC determination that Plaintiff could perform light work and agreed with the conclusion that Plaintiff is capable of work activity, but found that "the record more reasonably supports [her] ability to perform sedentary work with a sit or stand option alternatively at will."  (R. 17).

In making these findings, the ALJ gave little weight to Dr. Sowade's note indicating that he referred Plaintiff to a neurologist for dizziness that prevented her from working, finding it "conclusory with little explanation" and "vague and appear[ing] to be more of an excuse for her employer, excusing her for not being at work."  (R. 17-18).  In addition, the ALJ was not persuaded by Dr. Sowade's RFC assessment, submitted shortly before the hearing, because Plaintiff's treatment had been conservative, the opinion was inconsistent with the clinical findings, and an emergency room doctor had discharged Plaintiff to return to work with no restrictions.  (R. 18).

Moreover, the ALJ found that Plaintiff's testimony concerning her pain did not support a more limited RFC given that her pain treatment had been conservative, she refused to try epidural pain injections, and she currently took only over-the-counter Tylenol to manage her pain.  (*Id.*).  The ALJ also noted that her testimony about her daily living activities did not support a finding of disability.  (R. 18-19).  Finally, the ALJ concluded that the RFC's sit/stand option and environmental limitations are sufficient to address Plaintiff's

15

need to sit and avoid allergens, while her headache-induced confusion was not "so extraordinary" as to preclude sedentary work, particularly given that she was able to concentrate sufficiently to perform her current job, watch television, read, and attend church services. (R. 19).

The ALJ then found that Plaintiff is unable to perform her past relevant work as a telemarketer or sales associate because the RFC precludes it. (R. 19). Relying on the vocational expert's testimony, however, the ALJ concluded that there are other jobs that exist in sufficient numbers in the regional economy that Plaintiff can perform, given her age, education, work experience, and RFC. (R. 20). Accordingly, the ALJ found that Plaintiff was not disabled since filing her SSI application. (R. 20-21).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from

the evidence to the conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

## B. Disability Standard

In order to qualify for SSI, a claimant must establish that she is "disabled" and eligible for SSI benefits as defined by the Social Security Act. 42 U.S.C. §§ 416(i)(1), 1382(a)(1). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id.* at § 423(d)(2)(A). Gainful employment is "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that

the claimant is disabled," while a "negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

## C.    Analysis

In her motion, Plaintiff advances two main grounds for reversal. She first challenges the ALJ's RFC determination for three reasons. Plaintiff next argues that the ALJ erred in assessing her credibility. The Court addresses each argument in turn.

### 1.    The RFC Determination

Plaintiff challenges the ALJ's RFC finding on multiple grounds. In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform her past relevant work and/or adjust to other work, respectively, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2. This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5. An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger v. Astrue*, 516 F.3d at 544. As discussed below, there is substantial evidence to support the ALJ's RFC findings.

### a.    Treating Physician's Opinion

Plaintiff contends that the RFC is flawed because the ALJ failed to "give a sound explanation for rejecting Dr. Sowade's opinion." (Doc. 23 at 7). The opinion of Dr. Sowade, one of Plaintiff's treating physicians, consists in its entirety of a short note on his

prescription pad and an RFC assessment he prepared shortly before the hearing.  (R. 237, 468-472).

###### i.    Conservative Treatment

Plaintiff first argues that the ALJ erred in discounting Dr. Sowade's opinion based on the ALJ's determination that Plaintiff's treatment was conservative.  She asserts that the ALJ did not explain how her medical treatment was conservative, given her use of "narcotic pain medications" and her treatment at the pain clinic and during 19 emergency room visits from 2006 to 2008.  (Doc. 23 at 7).  But contrary to Plaintiff's assertions, the ALJ identified ample evidentiary support for his conclusion that Plaintiff's pain treatment had been conservative, namely that she declined the pain clinic physician's  recommendation of epidural pain injections and that at the time of the hearing she was taking only over-the-counter Tylenol to manage her pain.  (R. 18).  The ALJ also noted that Plaintiff previously had "good relief with physical therapy."  (*Id.*, citing R. 296).  Notably, the record contains no evidence of physical therapy beyond the records the ALJ referenced from October 2006.  (R. 295-296, 303-305, 307-308).

Plaintiff also is misguided in suggesting that her treatment at the pain clinic over a period of twenty months constitutes evidence that her treatment was not conservative.  The record is replete with medical records documenting the many instances in which Plaintiff declined to pursue more aggressive pain treatment recommend by her doctors, including declining epidural injections, neuropathic pain medication, and surgery, and expressly stating her desire to avoid any interventional pain therapies.  (R. 315-316, 324, 326).  Indeed, in April 2008, Dr. Landrum stated that due to Plaintiff's ongoing unwillingness to take anything other than short-acting medication for her pain, he was placing her on Tylenol

19

#3 at her request and referring her back to her primary care physician since her current medications "do not require management by an interventional pain physician." (R. 315). In his decision, the ALJ noted several instances in which Plaintiff declined recommended pain treatment. (R. 16, 18).

Likewise, Plaintiff is mistaken in stating that frequent emergency room visits disprove that her treatment was conservative. The ALJ acknowledged that Plaintiff frequently presented at the emergency room, including providing detailed descriptions of several emergency room visits. But, he also noted numerous instances throughout the relevant time period during which the examinations and objective medical tests performed at these visits were negative or normal, including examinations that showed Plaintiff had full range of motion and strength in the major muscle groups, normal gait, and intact neurological or sensory reflexes. (R. 15-17). The ALJ also noted instances where she had a negative or normal CT scan, EKG, and chest x-ray. (R. 16, 17). Although Plaintiff was diagnosed with a herniated disc prior to the time period of the emergency room visits, this Court's review of the record reflects that for all but one of the 19 visits, one or more of the following circumstances was present: (a) a physical examination showed no changes or was normal or non-acute (R. 317, 323, 329-330, 353, 425); (b) Plaintiff refused pain medication (R. 319-320, 328, 373); (c) objective testing produced normal results, including negative CT scans of the head and spine (R. 344, 345), normal EEG or chest x-rays (321-322, 344, 347-348, 353-354), and a normal ankle x-ray (R. 353); and/or (d) Plaintiff presented solely for the purpose of a physical therapy evaluation (R. 302) or a complaint that is not the subject of her SSI claim, namely a minor eye injury (388-389) and a respiratory infection (R. 400). Thus, Plaintiff's attempt to characterize her repeated emergency room visits as

evidence that her treatment was aggressive is belied by the absence of abnormal clinical findings or test results during those visits in combination with her repeated refusal of recommended pain medication. Plaintiff has not identified any basis for second-guessing the ALJ's finding that her treatment was conservative given the factual record showing treatment consisting primarily of short-acting pain medication and a small handful of physical therapy sessions and her decision to decline more powerful medication or aggressive treatment. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (deferring to ALJ's factual determination that claimant's treatment, consisting of "various pain medications, several injections, and one physical therapy session," was "relatively conservative.").

### ii.    Conclusory Opinion

Plaintiff next argues that the ALJ improperly discounted Dr. Sowade's opinion as "conclusory with little explanation" and "vague and imprecise." (R. 18). Plaintiff discusses why she believes the RFC questionnaire Dr. Sowade prepared in June 2009 was sufficiently detailed. (R. 468-472). But it was not the RFC questionnaire that the ALJ stated was lacking in detail. Rather, the ALJ's decision makes clear that the "opinion" he found conclusory, vague, and imprecise is "Dr. Sowade's note of December 1, 2008 stating that [Plaintiff] has been referred to a neurologist for evaluation of dizziness which has prevented her from working." (R. 18, citing R. 237). It is this one-sentence statement, written on the doctor's prescription pad, to which the ALJ expressly stated he assigned "little weight because the opinion is conclusory with little explanation" and is "vague and appears to be more of a work excuse for her employer, excusing her for not being at work." (R. 18-19). There can be no question that it is the note, and not Dr. Sowade's RFC

assessment, to which the ALJ refers, given that he explicitly characterizes the note as conclusory and vague, and later goes on to devote two lengthy paragraphs to explaining in detail his entirely different reasons for assigning little weight to Dr. Sowade's RFC assessment. (*Id.*).

Plaintiff does not attempt to argue that the ALJ erred in discounting the note as conclusory and vague, but such an argument would be unavailing in any event. An ALJ "is not required to accept a doctor's opinion if it 'is brief, conclusory, and inadequately supported by clinical findings.'" *Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)). Moreover, opinions concerning whether a claimant is disabled or unable to work are not medical opinions, but rather are opinions that are reserved for the Commissioner. 20 C.F.R. § 404.1527(e). Here, the ALJ reasonably found the one-sentence note to be conclusory since it contains no explanation as to the nature and severity of Plaintiff's dizziness or how Dr. Sowade reached the conclusion that it prevents Plaintiff from working, such as the factors or clinical findings he relied upon in reaching this conclusion. Indeed, it is even possible that Dr. Sowade referred Plaintiff to a specialist based solely on Plaintiff's subjective complaints. Moreover, the ALJ's decision identifies contrary medical evidence, specifying that in October 2008, shortly before Dr. Sowade wrote the note, Plaintiff presented in the emergency room complaining of dizziness, among other ailments, but "the attending physician released [her] to return to work that day with no noted restrictions, contrary to Dr. Sowade's opinion that she cannot work at all." (R. 18, citing R. 451). Accordingly, the ALJ did not err by discounting Dr. Sowade's note in assessing Plaintiff's ability to work.

### iii.    Dr. Sowade's RFC Opinion

Plaintiff next argues that the ALJ erred by not considering the factors set forth in the regulations prior to assigning little weight to the RFC assessment prepared by Dr. Sowade. It is well-established that a treating physician's opinion is entitled to controlling weight if two conditions are met: (1) the opinion is "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion is "not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 416.927(d)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)*; Clifford*, 227 F.3d at 870.  If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so.  *Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  The regulations specify that when an ALJ does not give controlling weight to a treating source's opinion, the ALJ will consider other factors to determine how much weight to give the opinion, namely (1) length of the treatment relationship and frequency of examinations, (2) nature and extent of the treatment relationship, (3) supportability of the opinion with evidence, particularly medical signs and laboratory findings, (4) consistency of the opinion with the record as a whole, (5) the source's area of specialty, and (6) other factors the claimant or others bring to the ALJ's attention.  *See* 20 C.F.R. § 416.927(d)(2)-(6).

In this case, the ALJ explained in detail why he declined to give controlling weight to Dr. Sowade's opinion that Plaintiff could stand or walk less than 2 hours and sit about 4 hours in an 8-hour workday, thereby precluding Plaintiff from performing even sedentary

work. (R. 18). The ALJ gave little weight to this opinion because it was inconsistent with the clinical findings and because Plaintiff's treatment was conservative, she had good relief with physical therapy, she declined epidural injections for her pain, and she managed her pain in the past with Tylenol #3 and, at the time of the hearing, with over-the-counter Tylenol. (*Id.*). In reaching this conclusion, the ALJ identified numerous supporting clinical findings in the record from both the consultative examiner and treating physicians other than Dr. Sowade, including physical examinations in February 2007 and October 2008 that showed Plaintiff had normal motor and muscle strength in her extremities, normal gait, and normal sensory reflexes. (*Id.*). The ALJ also emphasized that the physical exam in October 2008 — which was the last month for which the record contains any medical evidence other than Dr. Sowade's RFC assessment — showed she had full active range of motion in all extremities and full range of motion of the neck, and that the attending physician discharged her to return to work that same day with no restrictions. (*Id.*). Thus, the ALJ's decision not to give controlling weight to Dr. Sowade's opinion was well within his discretion, given the ample evidence he identified that contradicts Dr. Sowade's conclusion that Plaintiff is unable to perform even sedentary work. *See Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt*, 496 F.3d at 842.

Plaintiff's argument that the ALJ should have considered other factors under the regulations is hampered by Plaintiff's own failure to introduce any evidence pertaining to those factors. Plaintiff bears the burden of proof at each of the first four steps of the five-step analysis, including showing that she is disabled and is restricted in her ability to work. *Weathersbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). Here, Plaintiff makes a conclusory argument that the ALJ "failed to address the checklist of factors," but cites to

no evidence of any kind concerning those factors, let alone any evidence supporting a different outcome. (Doc. 23 at 9). There is no evidence in the record concerning the length, nature, or extent of the treatment relationship between Plaintiff and Dr. Sowade, nor is there evidence of the frequency of Dr. Sowade's examination of Plaintiff. *See* 20 C.F.R. § 416.927(d)(2)(i)-(ii). In fact, the record contains no treatment notes from Dr. Sowade whatsoever. Nor is there any evidence that Dr. Sowade specializes in an area relevant to his opinion, although his referral of Plaintiff to a neurologist seems to indicate that he does not specialize in the diagnosis or treatment of nervous systems disorders, such as the back pain, headaches, or dizziness at issue in this case. *See id.,* § 416.927(d)(5). The factors concerning evidentiary supportability and consistency were amply considered by the ALJ, who concluded that controlling weight was not merited given the absence of supporting medical evidence for Dr. Sowade's opinion and the numerous treatment notes and objective medical tests contradicting his opinion. *See id.,* § 416.927(d)(3)-(4). In sum, the burden is on Plaintiff to present supporting evidence, which she failed to do, and there is simply nothing in the record to suggest that consideration of these factors may have caused the ALJ to assign greater weight to Dr. Sowade's opinion. To the contrary, the evidence — comprising hundreds of pages of treatment notes and test results from other treating physicians, as well as a consultative examination and RFC assessment by state reviewing physicians — provides abundant support for the ALJ's conclusion that Plaintiff is not disabled and is not as restricted in her ability to work as Dr. Sowade's RFC assessment concludes.

Plaintiff also argues that the ALJ erred by not discussing in its entirety Dr. Sowade's RFC opinion concerning the impact of Plaintiff's pain on her ability to work. Specifically,

Plaintiff takes issues with the ALJ's omission of Dr. Sowade's statements that Plaintiff's pain would interfere with her ability to concentrate during an 8-hour workday, she is capable only of low-stress jobs, her impairments "were likely to produce good days and bad days," she requires hourly 10-minute breaks, and she likely would have more than four absences per month. (Doc.23 at 9-10). Plaintiff cites *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000), for the proposition that an ALJ must address a treating physician's report in its entirety and may not leave out portions that would support a finding of disabled. While it is true that an ALJ may not selectively discuss only those portions of a doctor's report that support the ALJ's conclusion while ignoring those that conflict with it, "the ALJ need not articulate his reasons for rejecting every piece of evidence." *Id.; see also Simila*, 573 F.3d at 516. Rather, the ALJ's decision must reflect an analysis of the evidence as a whole and must provide a "logical bridge" between the evidence and the ALJ's conclusion. *See Simila*, 573 F.3d at 516; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Hurley v. Astrue*, 714 F.Supp.2d 888, 898 (N.D. Ill. 2010).

Here, the ALJ satisfied that requirement. He explained his well-supported reasons for giving little weight to Dr. Sowade's opinion and instead relying more heavily on the many contrary medical opinions and tests from Plaintiff's other treating doctors at the emergency room and pain clinic, in combination with the assessments from the consultative examiners who relied on those medical records. As the ALJ stated, although Plaintiff has a herniated disc, the clinical findings by these physicians were normal and showed, among other things, full range of motion in her extremities and neck and full strength in her major muscle groups. (R. 18). The ALJ further noted that Plaintiff's most recent physical examination in the record, by an emergency room doctor in October 2008, produced similar clinical

26

findings and thus the attending doctor released Plaintiff that same day to return to work with no restrictions, contrary to Dr. Sowade's opinion that she cannot work at all. (*Id.*). Furthermore, the ALJ explained the reasons why Plaintiff's testimony did not support more stringent limitations on her ability to work. Specifically, the ALJ noted that Plaintiff works 20 hours per week as a sales associate and found not credible her testimony that pain prevents her from working more hours, given her conservative pain treatment, her "unwillingness to try epidural injections," her use of "regular strength over-the-counter Tylenol to manage her pain," and the fact that she had "good relief" through physical therapy in 2006. (*Id.*). The ALJ further concluded that Plaintiff's daily living activities also do not support a finding of disability, based on her testimony that she "manages her personal care; keeps her environment clean; prepares simple meals using the microwave; goes to the store with her daughter; walks around Wal-Mart without assistance; vacuums; watches television; and reads." (R. 18-19). Thus, the ALJ satisfied his obligation to provide a logical bridge between the evidence and his conclusion that Plaintiff is capable of working subject to the limitations in the RFC.

### iv.    Lack of Function-by-Function Analysis

Finally, Plaintiff argues that the ALJ made an "improper mistake of fact" in discounting Dr. Sowade's RFC assessment based in part on the erroneous conclusion that it lacked a function-by-function analysis of Plaintiff's abilities. (Doc. 23 at 7). The government acknowledges in its brief that the ALJ erred in concluding that such an analysis was lacking when it was not. (Doc. 31 at 5). Indeed, the regulations do not require a treating physician to provide a function-by-function analysis of a claimant's ability to perform daily living or work-related activities, nor is the ALJ required to provide one. *See Knox v.*

27

*Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) ("Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient.") (citing SSR 96-8p; *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004); *Depover v. Barnhart*, 349 F.3d 563, 567-568 (8th Cir. 2003)). Nonetheless, as the government argues, the error is harmless given the many other well-supported justifications the ALJ gave for rejecting Dr. Sowade's opinion, namely that the opinion is considerably inconsistent with the clinical findings from other treating and consultative physicians and that Plaintiff's history of treatment was conservative, physical therapy had helped her in the past, and she declined more aggressive pain relief treatment in favor of over-the-counter medication. (R. 18). *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding an ALJ's error harmless when "it would not affect the outcome of the case"); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (same). "Not every mistake by an ALJ so undermines a determination that it cannot be said to be supported by substantial evidence." *Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, *10 (N.D. Ill. Aug. 19, 2002); *see also Jones*, 623 F.3d at 1162 (finding that ALJ's mistake about claimant's pursuit of treatment did not undermine substantial evidence supporting credibility determination). The ALJ's error in this case concerning whether a function-by-function analysis was provided or was even necessary is not significant enough to undermine the large body of substantial evidence supporting his RFC determination.

### b.      Independent Medical Conclusion

Plaintiff next challenges the ALJ's RFC determination by arguing that the ALJ improperly reached an independent medical conclusion when he determined that Plaintiff is capable of sedentary work. Specifically, Plaintiff argues that the ALJ "crafted an RFC finding based on his perception of how [Plaintiff's] conditions limited her, rather than relying on evidence in the record." (Doc. 23 at 11). An ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record. *Clifford*, 227 F.3d at 870; *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). But the cases in which the courts have found an ALJ impermissibly "played doctor" are ones in which the ALJ failed to address the relevant evidence. *See Myles v. Astrue*, 582 F.3d 672, 677-678 (7th Cir. 2009); *Dixon*, 270 F.3d at 1177-1178 (collecting cases). That simply is not the case here.

Contrary to Plaintiff's assertions, and as discussed above in detail, the ALJ did not craft an RFC that was unsupported by the medical evidence; rather he relied upon the extensive evidence in the record from Plaintiff's treating physicians at the emergency room and pain clinic, and from the consultative examiner who relied upon those physicians' treatment notes and the objective test results. (R. 15-17). While the ALJ declined to give as much weight as Plaintiff would have liked to Dr. Sowade's opinion, the ALJ did nothing improper by relying more heavily on other medical opinions in the record. This case is distinguishable from *Suide v. Astrue*, 371 F. App'x 684 (7th Cir. 2010), upon which Plaintiff relies. There the ALJ discredited the treating physician's opinion and the state agency physician's RFC assessment, and failed to discuss how much weight she gave to the remaining medical opinions, instead relying upon the absence of evidence to craft an RFC

that the district court concluded was simply unsupported by the record. *See id.* at 688-690.

Similarly, *McCristal v. Astrue*, No. 09 C 7044, 2011 WL 2648591 (N.D. Ill. July 5, 2011), the other case upon which Plaintiff relies, is distinguishable. The district court in that case found that the RFC was not supported by substantial evidence given that the ALJ "constructed [the RFC] without citing to evidence in the record to support it" and instead relied upon the absence of any physician opinion to the contrary. *See id.* at *10.

In her reply brief, Plaintiff analogizes this case to *Scott v. Astrue*, 647 F.3d 734 (7th Cir. 2011), but that case also is factually distinguishable because it concerns an RFC limitation that was inconsistent with the record. *See id.* at 740-741 (concluding that the ALJ erred in imposing without explanation a weight-lifting limitation that was contrary to medical evidence and claimant's testimony). Unlike the cases cited by Plaintiff, the ALJ in this case identified and relied upon evidence in the record that supports the RFC, namely treatment notes and objective test results from other treating physicians and the examination and assessment of the state agency physician. That an ALJ in his discretion declines to rely as heavily upon the Plaintiff's preferred medical opinion does not render the ALJ's RFC determination an "independent medical conclusion" where, as here, the ALJ gave a well-supported justification for declining to give controlling weight to one medical source's opinion but instead identified other medical source opinions and objective medical evidence in the record that support his RFC determination.

In addition to her general argument on this issue, Plaintiff references two specific instances in which, she contends, the ALJ replaced a physician opinion with his own unsupported opinion. Neither example is persuasive. The first example is the ALJ's limitation of Plaintiff to sedentary work given the medical evidence concerning her herniated

disc, thus restricting Plaintiff's work capabilities to a greater degree than the state agency physician who determined she could perform light work. The second example is the ALJ's limitation that Plaintiff must avoid concentrated exposure to unprotected heights given her complaints of headaches and balance problems. (Doc. 23 at 11). But again, Plaintiff fails to explain how these conclusions by the ALJ are unsupported by substantial evidence. Plaintiff seems to suggest that it was improper for the ALJ to impose a more restrictive limitation than that recommended by the state agency physician in the first instance, or to impose a restriction based solely on Plaintiff's testimony in the second instance. Notwithstanding that both limitations favor Plaintiff, in both instances the ALJ's conclusion is supported by medical evidence and is consistent with the record. Indeed, the ALJ gave an exhaustive review of the medical evidence documenting Plaintiff's complaints of back pain, headaches and dizziness. (R. 15-17). Nor is there any medical evidence or testimony to the contrary. As discussed previously, it is the Commissioner, not any doctor, who makes the final determination whether a claimant is disabled or unable to work, and no doctor's RFC assessment is binding on the ALJ. *See* 20 C.F.R. § 404.1527(e) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *see also Rudicel v. Astrue*, 282 F. App'x 448, 453 (7th Cir. 2008). Here, the ALJ cited significant evidentiary support for his RFC determination and the RFC is consistent with the record, so the ALJ did not improperly "play doctor" in crafting the RFC.

### c. Plaintiff's Back Pain and Headaches

Plaintiff's final challenge to the RFC determination is that the ALJ failed to adequately consider her back pain and headaches in determining her RFC. She observes

31

that the ALJ did not discuss the severity of her back pain and how it might impact her ability to sustain sedentary work. But contrary to Plaintiff's assertion, the ALJ's decision notes in several places that Plaintiff has a large L5-S1 disc herniation and that she complained of back pain, and then explains how the medical evidence nonetheless supports the finding that she can perform sedentary work. (R. 14-17). For example, the ALJ describes the February 2007 consultative exam, which showed that Plaintiff was neurologically intact, had no paravertebral tenderness or spasm, exhibited normal range of motion and motor strength in her extremities, walked with a normal gait, and could squat, walk on her heels and toes, and get up from a seated position. (R. 16). Although the ALJ observed that Plaintiff reported "mild difficulty and pain walking more than a half hour, standing for more than 10-15 minutes or lifting more than 10 pounds," the physician's report documents no complaint of pain while sitting. (R. 16, 18, 222). Likewise, an October 2008 examination with a treating physician showed that Plaintiff had full range of motion in all extremities and her neck, full strength in the major muscle groups, normal gait, and intact sensory reflexes, and that the doctor released her to return to work that same day. (R. 16, 17). The ALJ went on to explain why the medical evidence did not support a conclusion that Plaintiff was unable to perform sedentary work, discussing that evidence in detail. (R. 17-18). The ALJ also explained that Plaintiff's testimony concerning her back pain did not persuade him to impose additional RFC limitations given that Plaintiff is able to perform her current job when allowed to take breaks to sit, which the RFC accommodates by limiting her to sedentary work with a sit/stand at will option. (R. 19). Indeed, the only evidence that Plaintiff's back pain prevents her from performing sedentary work is the RFC assessment from Dr. Sowade, to which the ALJ properly gave little weight for the reasons previously discussed.

While Plaintiff testified generally about being in pain, the ALJ expressly noted that Plaintiff also testified that she is able to perform her current job as a sales associate when allowed to take breaks to sit in a back room.  (*Id.*).  Accordingly, the ALJ's decision demonstrates that he adequately considered Plaintiff's back pain in determining her RFC.

Plaintiff also argues that the ALJ failed to adequately address her headaches in the RFC or explain how limiting her exposure to heights would accommodate her headaches. To support her argument, Plaintiff points to her frequent emergency room visits and her testimony that she has "severe" headaches daily.  But as the ALJ's decision observes, during her consultative examination with the state agency physician she complained only of "mild pain" from headaches, unless exacerbated by "stress or doing a lot of thinking," and she stated that she is able to treat the pain with Hydrocodone as needed.  (R. 16, citing R. 222).  Nor does the other medical evidence support the conclusion that she is unable to perform sedentary work due to her headaches.  For example, the ALJ emphasized that in April 2008 Plaintiff "requested to be placed on Tylenol #3" and sought medications only "between 'Tylenol and Tylenol #3,'" despite her prior success with various narcotic and opiate pain medications, including Hydrocodone and Darvocet.  (R. 16).  The ALJ also noted that two head CT scans in 2008 were negative.  (R. 14, 16).  Moreover, even the RFC questionnaire completed by Dr. Sowade, which the ALJ properly discounted, identifies only "neck pain and back pain," and makes no mention of headaches, in response to the request to "characterize the nature, location, frequency, precipitating factors, and severity of your patient's pain."  (R. 468).

As for Plaintiff's assertion that the RFC's limitation concerning exposure to heights bears no connection to her headaches, the ALJ's decision does not support this argument.

As the ALJ observed, Plaintiff testified that her headaches affect her ability to work because they "cause confusion." (R. 19, citing R. 44). The ALJ explained that he imposed the limitation to avoid concentrated exposure to unprotected heights due to Plaintiff's "headaches and complaints of being off balance at times" (R. 17), and it requires no leap of logic to understand why the ALJ would restrict someone with confusion and balance problems from being exposed to unprotected heights. Furthermore, the ALJ explained that he found unnecessary any further limitations to accommodate Plaintiff's headache-induced confusion given Plaintiff's own testimony that she was able to complete paperwork and input customer information at her current job, and that her occasional error in omitting or incorrectly entering a date was not "so extraordinary" as to preclude sedentary work. (R. 19). Thus, the ALJ adequately considered Plaintiff's headaches by addressing both the pain and confusion of which she complained.

As noted previously, the ALJ must "build an accurate and logical bridge from the evidence to the conclusion." *See Berger*, 516 F.3d at 544; *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons). The ALJ did so in this case. Accordingly, the ALJ committed no error in considering Plaintiff's back pain and headaches in determining her RFC.

## 2. The Credibility Assessment

This Court now turns to Plaintiff's challenge to the ALJ's credibility finding. Plaintiff argues that the finding is conclusory and improperly discounts her testimony about her pain and ability to work more than 20 hours per week. Specifically, Plaintiff argues that the ALJ first formulated Plaintiff's RFC, and then assessed whether her testimony fit within this RFC

and, in doing so, improperly discredited any testimony that did not correspond to the pre-determined RFC.

In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila*, 573 F.3d at 517 (quoting SSR 96-7p). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schaaf*, 602 F.3d at 875; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Still, an ALJ must connect his credibility determinations by an "'accurate and logical bridge'" to the record evidence. *Castile*, 617 F.3d at 929 (quoting *Shramek*, 226 F.3d at 811).

Plaintiff first contends that the ALJ erred by using prohibited "boilerplate" language that Plaintiff's statements concerning the intensity, persistence and limiting effects of her impairments are not credible to the extent those statements are inconsistent with the RFC findings. Plaintiff asserts that this is precisely the kind of conclusory and post-hoc determination that the Seventh Circuit found impermissible in *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-788 (7th Cir. 2003). There is no dispute that the use of such boilerplate credibility language alone is insufficient where the ALJ has not also provided

some substantive analysis of the basis for the determination. *See Punzio,* 630 F.3d at 709 ("[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence."); *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010) (finding boilerplate language "meaningless" because it "yields no clue to what weight the trier of fact gave the testimony").

But here the ALJ's "boilerplate" language was accompanied by a detailed factual basis for his determination. First, he expressly identified which aspect of Plaintiff's testimony he found not credible, noting that she currently works about 20 hours per week as a sales associate and then concluding, "I do not find [Plaintiff's] testimony regarding her inability to work more hours due to pain credible." (R. 18). Next, he provided a detailed explanation of how the contrary medical evidence and Plaintiff's own contradictory testimony support his determination not to credit her statement that she is unable to work more than 20 hours within the limitations in the RFC. Specifically, the ALJ found it significant that Plaintiff's treatment had been conservative, she was unwilling to try recommended epidural injections, she was currently taking only regular strength over-the-counter Tylenol to manage her pain, and she previously had good relief through physical therapy. (R. 18). In addition, the ALJ found that her activities of daily living likewise do not support her statement, given that she "manages her personal care; keeps her environment clean; prepares simple meals using the microwave; goes to the store with her daughter; walks around Wal-Mart without assistance; vacuums; watches television; and reads." (R. 18-19). Furthermore, the ALJ observed that Plaintiff "testified that she can stand 'a few minutes' before she has to sit down" and that in her current job "if there are no customers around, she can sit down in the back room." (R. 19). For these reasons, the ALJ found

Plaintiff's testimony not supportive of limitations greater that those set forth in his RFC assessment, which included, among other limitations, restricting her to sedentary work with a sit/stand option at will provided she is not taken off task more than 10% of the work period. (*Id.*).

Plaintiff further asserts that the ALJ erred by discrediting her statements regarding her pain "solely on the treatment she received" but without considering "prior work and efforts to work" and information about her symptoms and their effect on her ability to work. (Doc.23 at 15). Plaintiff does not identify which "statements" concerning pain the ALJ purportedly discredited without proper consideration, and the Court will not speculate. As noted above, the ALJ's credibility determination expressly considers Plaintiff's pain as it relates to her ability to work more than 20 hours per week, and the ALJ identified evidentiary record support for this determination, including discussing Plaintiff's testimony regarding her difficulty standing while performing her current job as a sales associate at Sears. (R. 18, 19). The RFC determination limits Plaintiff to sedentary work with a sit/stand at will option, further demonstrating that the ALJ took into account Plaintiff's testimony that she has difficulty performing her current job, which requires her to stand for much of the work day and which falls under the more strenuous category of light work. *See* 20 C.F.R. § 404.1567(a)-(b).

This same rationale applies to Plaintiff's argument that the ALJ failed to discuss how she could sustain a 40-hour work week when she "struggled" to work 20 hours per week in her current job as a sales associate. The ALJ's credibility determination expressly discusses Plaintiff's testimony that she has difficulty standing to perform her current job and "[t]herefore, consistent with [this] testimony," includes in the RFC the sit/stand at will option.

37

(R. 19). Thus, the ALJ credited Plaintiff's testimony about her difficulty standing to perform her current job, and accounted for this in the RFC by downgrading Plaintiff from light work to sedentary work with a sit/stand at will option, among other limitations. As the decision makes clear, the ALJ simply found Plaintiff not credible to the extent that she contends she still cannot work even when limited to a sedentary job that allows her to sit at will.

In sum, it cannot be said that the ALJ's credibility determination was conclusory or lacking in evidentiary support given that the ALJ explained the weight he gave to Plaintiff's testimony and provided a well-supported rationale for his determination, including relying on objective medical evidence and Plaintiff's treatment, medication, and work and daily activities. Indeed, as the ALJ explained, he accounted for Plaintiff's testimony about her pain and difficulty standing by crafting an RFC that limits her to sedentary work with a sit/stand at will option, among other limitations. And the ALJ pointed to evidentiary support for his determination that Plaintiff's testimony does not support limitations greater than those in the RFC. This is in stark contract to *Brindisi* where the court found that the credibility determination was not supported by substantial evidence because the ALJ "does not explain the weight given to the Brindisis' statements and does not support [the] determination with any evidence in the record." *Brindisi*, 315 F.3d at 788. Accordingly, the ALJ committed no error in making a credibility determination.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 22] is denied and Defendant's Motion for Summary Judgment [Doc. 30] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: March 5, 2012

_____

SHEILA FINNEGAN
United States Magistrate Judge